**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

   -  v.  -

MARC DEMANE DEBIH,

          Defendant.

No. S3 18 Cr. 184-01 (DLC)


**<u>SENTENCING MEMORANDUM OF MARC DEMANE DEBIH</u>**


Sean S. Buckley
Steven G. Kobre
Jeffrey Newton
800 Third Avenue
New York, New York 10022
Tel: 212 488 1200
Sean.Buckley@kobrekim.com
Steven.Kobre@kobrekim.com
Jeffrey.Newton@kobrekim.com


*Attorneys for Defendant Marc Demane*
*Debih*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

    I.  Mr. Debih's Early Life and Career.................................................................................... 2

    II.  Involvement in Insider Trading........................................................................................ 4

    III. Mr. Debih Ceases His Involvement in Insider Trading Nearly One Year Before He Is
        Arrested ............................................................................................................................ 4

    IV. Mr. Debih's Prompt Cooperation and Acceptance of Responsibility ................................. 8

APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS ........................................................ 12

    I.  The History and Characteristics of the Defendant and the Nature of the Offense (§
        3553(a)(1))....................................................................................................................... 13

    A. The Nature and Circumstances of the Offense ............................................................... 13

    B. An Individualized Assessment of Mr. Debih's Personal Characteristics Warrants a
        Mitigated Sentence........................................................................................................... 14

    II.  Respect for the Law and Just Punishment (§ 3553(a)(2)(A)) ........................................... 22

    A. No Prison Term Is Necessary to Satisfy the Requirements of § 3553(a) ........................ 23

    B. Mr. Debih's Pre-Sentencing Confinement Eliminates the Need for Further Incarceration
        24

    C. Mr. Debih's Agreement to Forfeit $49 Million Adds to the Punishment He Has Already
        Received and Eliminates the Need for Any Fine.............................................................. 27

    █ Mr. Debih ██████████████████████████████.................................. 28

    III. Deterrence and Protection of the Public (§ 3553(a)(2)(B and C)) ...................................... 29

    IV. The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6)).......................... 31

    A. Sentencing Mr. Debih to Prison Would Create Disparities With Respect to Others
        Involved in the Insider Trading Ring ............................................................................... 31

    B. A Sentence of Imprisonment Imposed on Mr. Debih Would Be More Severe Than An
        Equivalent Sentence Imposed on an Identical Offender with Different Citizenship........ 33

    C. Imposing a Mitigated Sentence Is Fully Consistent With Similar Outcomes in the Second
        Circuit and Nationwide .................................................................................................... 34

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*
    552 U.S. 38 (2007) ................................................................................ 12

*Kimbrough v. United States*
    552 U.S. 85 (2007) ................................................................................ 12

*Koon v. United States*
    518 U.S. 81 (1996) ................................................................................ 13

*Pepper v. United States*
    562 U.S. 476 (2011) .............................................................................. 14

*Rita v. United States*
    551 U.S. 338 (2007) .............................................................................. 12

*United States v. Adelson*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................. 29

*United States v. Akhavan*
    2021 WL 3862123 (S.D.N.Y. Aug. 30, 2021) ................................ 27, 28

*United States v. Bills*
    401 F. App'x 622 (2d Cir. 2010) .......................................................... 20

*United States v. Blake*
    89 F. Supp. 2d 328 (E.D.N.Y. 2000) .............................................. 13, 21

*United States v. Blaszczak*
    No. 17 Cr. 357 (LAK) (S.D.N.Y.) ........................................................ 21

*United States v. Brady*
    2004 WL 86414 (E.D.N.Y. 2004) ........................................................ 23

*United States v. Carty*
    264 F.3d 191 (2d Cir. 2001) ................................................................. 26

*United States v. Coughlin*
    2008 WL 313099 (W.D. Ark. Feb. 1, 2008) ........................................ 23

*United States v. Edwards*
    595 F.3d 1004  (9th Cir. 2010) ................................................................. 29

*United States v. Fernandez*
    443 F.3d 19 (2d Cir. 2006) ........................................................................ 12

*United States v. Gonzalez*
    No. 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021) .................................... 7, 26

*United States v. Harding*
    2006 WL 2850261 (S.D.N.Y. Sept. 28, 2006) ......................................... 21

*United States v. Hasanoff*
    2020 WL 6285308 (S.D.N.Y. Oct. 27, 2020) .......................................... 23

*United States v. Hernandez,*
    2005 WL 1242344 (S.D.N.Y. May 24, 2005) .......................................... 30

*United States v. Husein*
    478 F.3d 318 (6th Cir. 2007) .................................................................... 22

*United States v. Isola*
    548 F. App'x 723 (2d Cir. 2013) .............................................................. 20

*United States v. Johnson*
    964 F.2d 124 (2d Cir. 1992) ..................................................................... 20

*United States v. Leung*
    40 F.3d 577 (2d Cir. 1994) ....................................................................... 34

*United States v. Martin*
    520 F.3d 87 (1st Cir. 2008) ...................................................................... 22

*United States v. McCormick*
    2017 WL 492506 (M.D. Tenn. Feb. 7, 2017) ..................................... 14, 22

*United States v. Salvador*
    2006 WL 2034637 (S.D.N.Y. July 19, 2006) .................................... 24, 25

*United States v. Sanpedro*
    352 F. App'x 482 (2d Cir. 2009) .............................................................. 24

*United States v. Torres*
  2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005) ......................................................... 25

*United States v. Williams*
  662 F. App'x 366 (6th Cir. 2016) ............................................................................ 30

*United States v. Wunder*
  2010 WL 654754 (D. Kan. Feb. 23, 2010) ............................................................. 19

**STATUTES**

18 U.S.C. § 3553(a) ................................................................................................. passim

**OTHER AUTHORITIES**

*Deterrence in the Twenty-First Century*,
  42 CRIME & JUST. 199 (2013). ............................................................................. 31

*Five Things About Deterrence*,
  Nat'l Inst. Of Justice (2016) ................................................................................... 30

*Deterrence and Macro-Level Perceptions of Punishment Risks: Is there a "Collective Wisdom"?*
  59 CRIME & DELINQ. 1006 (2013) ....................................................................... 30

*Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*
  U.S. Department of Homeland Security, Office of Inspector General Report,
  OIG 19-47 (June 3, 2019). ...................................................................................... 33

## PRELIMINARY STATEMENT

Defendant Marc Demane Debih ("Mr. Debih") recognizes that he badly lost his way by participating in a vast, international ring of insider trading prior to 2018.  He acknowledges that his actions were morally wrong, contrary to law, harmful to public confidence in our markets, and, perhaps most importantly to his rehabilitation, not in keeping with the standard he wished to set for his own children.  Mr. Debih's recognition of these facts is why he made the unilateral decision to cease his involvement in the charged conduct—nearly a year ***before*** he was confronted by law enforcement—prompted by the birth of his first child.

Mr. Debih came to the realization that to set the example he wishes for his own children, he must accept responsibility and atone for his actions and try, as best he can, to make things right. That is why Mr. Debih made the decision to fully cooperate, and be transparent, with authorities about the full scope of wrongdoing he participated in, even though this created personal risk to Mr. Debih himself as well as to his family.  Underscoring Mr. Debih's commitment to accountability and cooperation, he ███████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████  That cooperation was thorough, timely, truthful, and, in the Government's own words, "extraordinary"—culminating in the return of numerous indictments against other individuals based on the information he provided as well as his testimony before this Court in the trial of Telemaque Lavidas.  *See* Government Sentencing Submission (ECF No. 35 at 5).

Yet the impact of Mr. Debih's cooperation goes beyond unraveling a single long-running and widespread conspiracy; his cooperation put a spotlight on misconduct within some of the world's largest and best-known financial institutions.  The deterrent effect of such prosecutions—

enabled by Mr. Debih's cooperation—is significant, and goes far beyond the scope of individual cases.  In this regard, Mr. Debih's cooperation may have helped protect markets in the future by instilling in traders worldwide the lesson of what happens when the U.S. securities laws are violated.

Mr. Debih deeply regrets his involvement in the charged conduct, and he has done everything he could since that time to atone for those wrongs—most notably offering extremely timely, detailed, and corroborated cooperation to the authorities that resulted in not only indictments but convictions of individuals whose malfeasance previously was unknown to the U.S. authorities.  We respectfully submit that Mr. Debih's substantial assistance, contrition, and desire to participate in his children's lives merits a sentence without further incarceration or fines.

This submission proceeds in two parts.  The first is a recitation of Mr. Debih's personal history and characteristics, from his childhood years and formative experiences, through his experience in the insider trading scheme.  Following that will be a discussion applying the 18 U.S.C. § 3553(a) factors to the facts of this case.

## FACTUAL BACKGROUND

### I. Mr. Debih's Early Life and Career

Marc Demane Debih was born on ▮▮▮▮▮▮ 1970, in Paris, France, as the only child of his parents Jacque Marius Ahmed Demane Debih and ▮▮▮▮▮▮▮▮▮.  PSR ¶ 75.  Mr. Debih's mother was a political refugee in France from Spain, where her father (Mr. Debih's grandfather) had been killed by the Franco regime when she was a child.  Mr. Debih was raised by his parents in Paris until the age of two, when his mother and father separated and subsequently divorced.  *Id.* ¶ 76.  From the age of two to eight, Mr. Debih primarily was raised by his mother—a beautician— with the aid of child support paid by his father, a consultant in the international construction and cosmetics industries.  *Id.*

2

At the age of eight, Mr. Debih was placed in boarding school outside Paris.  *Id.*.  When not at school, Mr. Debih continued for several years to reside with mother.  *Id.*.  However, beginning around age 13 or 14, Mr. Debih began to see less and less of his mother, with their face-to-face contact dwindling by his high school years.  As a result, during this time Mr. Debih spent most of his holidays and school vacations with his father.  Mr. Debih graduated from Institut Florimont, a boarding school located in Geneva, Switzerland, in 1990.  *Id.* ¶ 88.

Following graduation from high school, Mr. Debih pursued advanced studies, and in 1994 he graduated from the Business School of Lausanne, in Switzerland, with a bachelor's degree in economics.  *Id.* ¶ 86..  Two years later, in 1996, Mr. Debih received a Master's in Business Administration from the European University Business School, located in Geneva, Switzerland. *Id.* ¶ 85.

After business school, Mr. Debih served for several months as a trainee at an entity then known as Indosuez Bank, which was subsequently acquired by French banking giant Credit Agricole.  *Id.* ¶ 96..  From 1996 into 1997, Mr. Debih was employed by Bank Dumenil Leble, a Luxembourg-based bank.  *Id.*  From Bank Dumenil Leble, in 1997 Mr. Debih went to work for his father, assisting the elder Mr. Debih in international business relationships in Switzerland and Vietnam.  *Id.*.

Mr. Debih ceased working for his father in or about 1999, and assumed a role at Marfin Investment Group in Athens, Greece. *Id.*. From 2001 to the mid-2000s, Mr. Debih pursued several ultimately unsuccessful international entrepreneurial business opportunities, including in Serbia, Namibia, the Democratic Republic of Congo, and the Ivory Coast. *Id.*.

## II.    Involvement in Insider Trading

Mr. Debih's fateful decision to engage in insider trading has haunted him since well before this proceeding was initiated, and the separation from his family caused by that decision will continue to haunt him in the years to come. That involvement began by happenstance when Mr. Debih's longtime friend introduced him to another individual who had previously made profitable trades using inside information. That individual proceeded to introduce Mr. Debih to another participant in the scheme, and the situation snowballed from there. As Mr. Debih has acknowledged, he ultimately participated in insider trading activity from December 2012 through November 2017 involving several companies listed on the New York Stock Exchange and NASDAQ. Mr. Debih's role in this insider trading network has been described at length in the Indictment to which he pled guilty, the testimony he provided in a related case before this Court, and in the Probation Office's Presentence Report; Mr. Debih does not rehash or dispute those points here. Suffice it to say, Mr. Debih is aware that what he did was wrong, that it was a crime, and that he rightly has been held to account for that conduct.

## III.   Mr. Debih Ceases His Involvement in Insider Trading Nearly One Year Before He Is Arrested

Mr. Debih unilaterally ceased his involvement in the insider trading ring nearly a year before his October 2018 arrest, in or about November 2017—around the time at which his first daughter was born. This timeline makes clear that his decision to stop his unlawful activity was

made well before he was confronted by authorities and arrested on October 31, 2018 in Belgrade, Serbia, in front of his pregnant wife and infant daughter.

From October 31, 2018 to May 10, 2019 while extradition matters were being addressed, Mr. Debih was remanded to the custody of a Serbian prison in Belgrade.  The conditions inside the prison were harsh and well below those deemed acceptable in the United States, as has been confirmed by Non-Governmental Organizations reviewing Serbian prisons in recent years.[1]  As Mr. Debih describes in his accompanying letter (Ex. 1),[2] for 23 hours per day, he shared a single 400 square foot cell with nine other prisoners, where they all shared one toilet and one sink, without hot water.  A single radiator in the cell provided heat for only eight hours per day, while the average low temperature in Belgrade during the months of December to February (which Mr. Debih served) is below freezing.  Mr. Debih could not speak with or address any staff at the prison to communicate his needs, because none of them spoke English or French, the two languages in which Mr. Debih most fluently communicates.  Bathing was permitted either once or twice per week, for five minutes, and cockroaches were a constant presence.

Unlike in American prisons, smoking remained permissible in Serbian facilities, and many of the inmates smoked, while opening windows was not permitted—a particularly undesirable condition of confinement for Mr. Debih, a non-smoker.  The food provided was both meagre and unpalatable, with serious deficiencies in basic hygiene.  The facility did not allow phone calls or emails, and letters into and out of the facility were not permitted for Mr. Debih because he neither

---

[1] See, e.g., *Torture and Ill-treatment in Serbia: Alternative Report to the UN Committee Against Torture* (April 2015) at 16, *available at* https://tbinternet.ohchr.org/Treaties/CAT/Shared%20Documents/SRB/INT_ CAT_CSS_SRB_20088_E.pdf  ("The worst living conditions have been detected in the County Prison in Belgrade [and two other institutions]. In these institutions, long-term accommodation can amount to inhumane and degrading treatment.")

[2] At the request of counsel, Mr. Debih detailed his conditions of confinement in his letter to the Court, to provide the Court and the parties with a factual predicate to evaluate the points that follow.

speaks nor writes Serbian, and the local guards would only permit outside contact that could be monitored in their native language.

In addition to these hardships, during Mr. Debih's pre-extradition detention, he was permitted only three family visits of forty-five minutes with his wife per month. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

Once transferred to the United States and housed at the Metropolitan Correctional Center ("MCC"), the conditions of Mr. Debih's confinement improved slightly, but remained deficient pursuant to any normal standard. The squalid and unsafe conditions at the MCC have been thoroughly documented in recent years,[3] and Mr. Debih's confinement there was, unfortunately, no different. During Mr. Debih's confinement at the MCC from May 10, 2019 to January 28, 2020, his unit frequently lacked hot water for bathing, consistent with an Associated Press

---

[3] *See, e.g.*, Michael Balsamo and Michael R. Sisak, *Metropolitan Correctional Center, Jail Where Jeffrey Epstein Died, Is Crumbling*, Associated Press (Sept. 23, 2021) (hereinafter "MCC AP Investigation"), *available at* https://apnews.com/article/health-prisons-new-york-manhattan-coronavirus-pandemic-5113a1e33a0 c3967787e04c0523e406b; Larry Neumeister, *Fed lockup where Epstein died gets harsh coronavirus review*, Associated Press (May 29, 2020), *available at* https://apnews.com/article/14c8578348d3b90f8e6e4fa56b409c16; Michael Balsamo and Michael R. Sisak, *Gun found inside Epstein jail during lockdown*, Associated Press (Mar. 5, 2020), *available at* https://apnews.com/article/us-news-ap-top-news-weekend-reads-manhattan-prisons-b01bcff4beda06346f90e1b8edd25b03.

investigation which observed that "[t]he pipes are so old they sometimes stop working," and that "repairing them is costly and requires cutting water, heat, or air conditioning to the entire jail." *See* MCC AP Investigation.  Rats were daily visitors to Mr. Debih's unit, and cockroaches were frequently observed as well.  More troubling, in the eight months he was confined at the MCC, he was only permitted outside a total of twelve times for an hour each, due to staffing shortages at the facility.  *Cf.* MCC AP Investigation (noting the Bureau of Prisons' "critically low staffing levels").  In other words, during his time at the MCC he was confined indoors for more than 99.8% of the time.  Other judges in this District have observed that the MCC's failings in the past several years have justified granting defendants increased credit for time served under unacceptable conditions. *See, e.g.*, *United States v. Gonzalez*, No. 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), ECF No. 250 at 17:17-18:5 (noting that defendant's pre-sentence confinement of 24 months in the MCC "is equivalent to having served three years.").  Despite the substandard conditions afflicting the MCC, Mr. Debih attempted to make the best of the situation by enrolling in, and completing, more than ten educational courses during his custody, including classes in marketing and management.  Mr. Debih also worked at the MCC library until his impending testimony as a cooperating witness led to his separation from the general population.

Even setting aside the conditions of Mr. Debih's confinement, the simple fact of his separation from his family for 22 months from October 31, 2018 to September 3, 2020 (when he was permitted to return to Serbia) has had heartbreaking, and continuing, ramifications. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

7

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

**IV.    Mr. Debih's Prompt Cooperation and Acceptance of Responsibility**

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ culminating in

more than a dozen in-person proffer and debriefing sessions between Mr. Debih and the authorities

██████████████████ as well as several more attorney proffers in response to questions or requests

posed by the Government—███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Mr. Debih also retrieved and turned over a number of

electronic devices to the Government, providing crucial documentary corroboration of the

statements made during his proffer sessions. █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

Mr. Debih's cooperation was publicly confirmed in December 2019 following the Final

Pretrial Conference in the *Lavidas* trial, further exacerbating the potential risk of harm to himself

and his family.[4]  Nevertheless, as this Court is aware, Mr. Debih continued to fulfill his agreement with the Government and took the stand to testify at the trial of Telemaque Lavidas before this Court in January of 2020, which testimony garnered global news coverage.[5]

    That cooperation has had substantial collateral consequences for Mr. Debih: ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[4] *See* Bob Van Voris, *Swiss Trader Set to Be Star Witness at U.S. Insider Trial*, BLOOMBERG (December 19, 2019 4:52 pm ET), https://www.bloomberg.com/news/articles/2019-12-19/mysterious-swiss-trader-tied-to-insider-rings-will-testify.



[6] ████████████████████████████████████████████████████



*SEC v. Taylor et al.*, No. 19 Civ. 9744 (LAP) (S.D.N.Y.)

(naming four defendants); *SEC v. Feingold et al.*, No. 20 Civ. 1881 (LAP) (S.D.N.Y.) (naming an

additional two defendants and seven relief defendants).

In addition to providing critical information regarding myriad criminal acts, on October 3,

2019, Mr. Debih himself pled guilty before the Hon. Vernon S. Broderick to all thirty-eight counts

of a Superseding Indictment, thereby sparing the Government, the Court, and jurors the time and

expense of conducting a trial. Notably, in deciding to plead guilty, Mr. Debih expressly consented

to the entry of a Preliminary Order of Forfeiture directing him to forfeit $49 million to the

Government. Following Mr. Debih's guilty plea, Mr. Debih continued to take steps to try to

facilitate the transfer of these funds, ████████████████████████████████████████

████████████████████████████████████████

Mr. Debih remained incarcerated at the MCC for several more months after entry of his

guilty plea, including throughout his testimony at the trial of Telemaque Lavidas. Ultimately, Mr.

Debih was released from pretrial detention on or about January 28, 2020—fifteen months after his

initial arrest.

However, Mr. Debih remained subject to significant restrictions even while on bail.

Indeed, from January 28, 2020 to September 3, 2020, he was subject to "home" confinement in

New York City—which was, in truth, thousands of miles away from his actual home, and the six-hour time difference between New York and Serbia further complicated Mr. Debih's attempts to keep in communication with his young children.  During this time, he was permitted only four hours per week outside of his residence in New York City during the most dire period of the pandemic.  In addition, due to the then-ongoing coronavirus emergency, Mr. Debih was forced to relocate on several occasions with little notice due to hotel closures necessitated by coronavirus response measures.  And when he was able to remain in one place, he often was confined there around the clock.  Indeed, during an approximately ten-week period during the depth of the pandemic, Mr. Debih was not permitted to leave his room at all.  Moreover, during this time—while the coronavirus raged in Europe—Mr. Debih was confronted with the possibility that his wife may become ill and not be able to care for his children.  With his wife's parents unable to easily travel to be with her and no other family available, Mr. Debih was forced to contemplate the possibility that his children would be deprived of their sole caregiver at a time when he was not able to travel to assist.

Even though Mr. Debih has now pled guilty and, as of September 2020, released on bond so he could reunite with his family and meet his second daughter, Mr. Debih and his family still suffer daily from the stress and fear engendered by Mr. Debih's involvement in this affair.  Indeed, Mr. Debih is well aware that the fact of his cooperation with authorities is now widely known, ▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆



\*            \*            \*

Mr. Debih understands that his actions were morally wrong, unlawful, and harmful to both the markets at large, and his own family.  His most ardent regret is that the moral clarity he gained in late 2017—upon seeing the birth of his first daughter—did not come sooner.  While Mr. Debih may have followed in the footsteps of poor role models ███████████, he recognizes that this does not absolve him of responsibility for his criminal acts, and he understands that only by recognizing and accepting his errors will he, and his family, be able to chart a new path.

### APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS

As the Court knows, the Sentencing Guidelines are no longer mandatory and are not even presumed to be reasonable; they are just one of many factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in § 3553(a).  *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007).  The Court must conduct its own evaluation of the § 3553(a) factors and may "reject (after due consideration) the advice of the Guidelines."  *Kimbrough v. United States*, 552 U.S. 85, 113 (2007).

This is an unusual and atypical case where the scope of the defendant's cooperation has been exceptionally broad:  Mr. Debih has provided the authorities with substantial assistance in the form of information regarding a myriad of other criminal offenses across several jurisdictions over an extended time period.  "Atypical cases were not adequately taken into consideration" by the Guidelines, and as a result "factors that may make a case atypical provide potential bases for departure."  *Koon v. United States*, 518 U.S. 81, 94 (1996).   Nevertheless, the overarching provision of § 3553(a) is the same in extraordinary cases as it is elsewhere: to impose a sentence sufficient, but not greater than necessary, to meet the goals of sentencing established by Congress. Adherence to this principle means that if a sentence other than imprisonment would be sufficient to meet those goals, then the Court *must* impose such an alternative.   After considering and applying the relevant § 3553(a) factors which are discussed further below, we respectfully submit that a sentence should be imposed which does not require incarceration or an additional fine.

I.   **The History and Characteristics of the Defendant and the Nature of the Offense (§ 3553(a)(1))**

A.  **The Nature and Circumstances of the Offense**

Mr. Debih recognizes that he engaged in serious criminal conduct, which he does not dispute, and for which he knows that can and should be held accountable.  Even where—as here— the defendant concedes guilt, the law requires that, in fashioning an appropriate sentence, courts should "attempt[] to understand (as best one can) what set a defendant upon [an] illegal course." *United States v. Blake*, 89 F. Supp. 2d 328, 332 (E.D.N.Y. 2000).  Here, that analysis must take account of the fact that ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

█████████████████████████ While this does not excuse Mr. Debih's conduct, as a legal matter § 3553(a) makes that context relevant in determining his sentence. *See, e.g.*, *United States v. McCormick*, No. 3:15-cr-00009-1, 2017 WL 492506, at *10 (M.D. Tenn. Feb. 7, 2017) ("The context in which the offense took place indicate [defendant] was unusually influenced by a number of factors, including untreated mental health issues (depression, anxiety, and a 'maladaptive' desire to please) . . . and other issues. While these circumstances do not excuse [defendant's] conduct, they do help to explain it."). Thus, even though Mr. Debih lacked appropriate role models in his younger years, he acknowledges that he is responsible for engaging in serious criminal conduct and appropriately is being held accountable for it.

### B. An Individualized Assessment of Mr. Debih's Personal Characteristics Warrants a Mitigated Sentence

In determining the particular sentence to be imposed, 18 U.S.C. § 3553(a)(1) directs the Court to consider the "history and characteristics of the defendant." This ensures "that the punishment will suit not merely the offense but the individual defendant." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citation omitted). Here, we respectfully submit that three particular characteristics of Mr. Debih militate in favor of a reduced sentence.

#### 1. Mr. Debih's Extensive Cooperation With the Government

*First*, we respectfully submit that Mr. Debih's acceptance of responsibility for his crimes and cooperation with the government are highly relevant to the § 3553(a) analysis of his nature and characteristics. As this Court has recognized, "cooperation has many components to it." *Fernandez*, 443 F.3d at 24. One aspect is timing—that is, whether the defendant only elected to cooperate after facing the prospect of a lengthy prison term. *See id.* (noting that defendant "decided it was in her interest to try to cooperate" comparatively late in the proceedings). However, for the purposes of sentencing, the Court specifically noted that:

14

> [C]ooperation is important because of what light it might shed on the character of a defendant, whether it shows the defendant has recognized the full implications of the choices they made in the past; whether they have decided to make a clean and full break with that and change their life in a significant way. On occasion cooperation really is a reflection of a dramatic change in the person's life.  And that resonates in a way, in all the ways that one must consider a sentence, including the likelihood of rehabilitation, the necessity for individual deterrence, the need for additional punishment beyond that already imposed and suffered by a defendant.

*Id.* at 24-25.

We respectfully submit that Mr. Debih's cooperation— ██████████████████
████████████████████████████████ —"shows [that he] has recognized

the full implications of the choices [he has] made in the past" and has "decided to make a clean

and full break with that and change [his] life in a significant way."  *Id.* at 24.

███████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████

███████████████████████████████████████

██████████

As detailed in the Government's Sentencing Submission (ECF No. 35 at 4), following his arrival in the United States, Mr. Debih participated in "well over a dozen" additional proffer sessions with the Government.  During these sessions, Mr. Debih "discussed his participation in and historical knowledge of insider trading, including detailed information about many of his criminal associates." *Id.*  These sessions were "particularly helpful" in the eyes of the Government "because he provided information not just about the conduct that the Government had already uncovered and charged, but also deals and individuals that the Government had not yet charged." *Id.*  As the Government explains, "[b]ased in large part on information" provided by Mr. Debih, "the Government was able to substantially advance its investigation of [Georgios] Nikas, [Telemaque] Lavidas, [Bryan] Cohen, [Dov] Malnik, and [Tomer] Feingold," all of whom have been charged, and three of whom have been convicted and sentenced for their conduct. *Id.* at 5.

In addition to his proffer statements, Mr. Debih also "provided the Government with paper records and electronic devices that contained substantial amounts of evidence" regarding "the criminal conduct of his co-conspirators." *Id.* at 4.  The Government describes this evidence as "valuable sources of proof and corroboration to enable the Government to pursue additional investigation and prosecution of members of this criminal network." *Id.*  And beyond the voluminous evidence provided in the form of proffer statements and documents, Mr. Debih also appeared to testify at the trial of Telemaque Lavidas before this Court.  In the Government's description, Mr. Debih "testified credibly about the Ariad insider trading scheme[,]" and his

testimony "was an important component of the Government's case against Lavidas, who was ultimately convicted." *Id.* at 5.

Mr. Debih's cooperation was not only complete and heartfelt, it was instrumental to numerous government investigations.  As recounted in the Government's Sentencing Submission, "the Government has been able to charge, arrest, and convict numerous participants in the above-described international criminal network" because of Mr. Debih's cooperation. *Id.* at 3.  Notably, Mr. Debih's cooperation, and the prosecutions enabled by it, shined a public light on misconduct at well-known market participants, including the actions of Bryan Cohen (a former Goldman Sachs banker) and those of bankers at Moelis & Co. (who provided non-public information to co-conspirator John Dodelande).  There is a significant deterrent effect to prosecutions involving employees of these prominent institutions, and without Mr. Debih's cooperation, their involvement may never have come to the attention of authorities.

Further, Mr. Debih continued his cooperation—including public testimony against Mr. Lavidas—despite harboring "serious and understandable concern about [his family's] safety" resulting from his assistance to authorities. *Id.* at 6. █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████   As the Government's Sentencing Submission acknowledges, "[t]he Court should

take these concerns [about his family's safety] and actions into account in giving [Mr. Debih]

appropriate credit for his assistance to the Government." *Id.*[7]



The fact that Mr. Debih continued in his

cooperation despite this significant, known risk simply underscores that he has "decided to make

a clean and full break with [his criminal past] and change [his] life in a significant way."

*Fernandez*, 443 F.3d at 24; *see also* PSR at 28

---

[7] Mr. Debih also continued with his cooperation despite leaks regarding his cooperator status prior to his public testimony.



Finally, Mr. Debih has also taken affirmative steps to effectuate the forfeiture of $49 million, to which he agreed in his plea and cooperation agreement.

### 2. Mr. Debih's Commitment to His Family and Participation in His Children's Lives

*Second*, Mr. Debih has at all times been, and to this day remains, committed to supporting his family and participating fully in the life of his children. This, too, weighs in favor of a mitigated sentence without further imprisonment and separation from his children. *Cf. United States v. Wunder*, No. 09-40052-01-RDR, 2010 WL 654754, at *4 (D. Kan. Feb. 23, 2010) ("While some criminals are themselves a negative influence upon their families, that is not the case here."). As described above, it was the birth of Mr. Debih's first child which caused him—***before*** the appearance of government investigators—to change his ways by unilaterally ceasing his involvement in insider trading. This rapid about-face, while it clearly cannot absolve Mr. Debih of his past wrongs, is precisely the sort of "change in [a] person's life" that the Court has previously recognized "resonates" at the point when the Court must determine an offender's sentence. *Fernandez*, 443 F.3d at 24.

To impose further confinement on Mr. Debih would not only harm him, but would increase the burden on his wife and cause collateral consequences for his children who may be compelled to grow up without their father.  This, too, counsels in favor of forgoing incarceration in this case. *See, e.g., United States v. Isola*, 548 F. App'x 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the effects of his incarceration on his daughter" as one of the factors to be considered under 18 U.S.C. § 3553(a)); *United States v. Bills*, 401 F. App'x 622, 623 (2d Cir. 2010) (holding that "the likely effects of [defendant's] incarceration on her daughter" were one of the "mitigating factors" that was appropriately considered under 18 U.S.C. § 3553(a)); *see also United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992).

The repercussions would be particularly dire in this case if Mr. Debih were further separated from his family: ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  *See, e.g.*, *United States v. Blaszczak*, No. 17 Cr. 357 (LAK) (S.D.N.Y.), ECF

No. 412 at 70:16-23 ("The wreckage that a long period of incarceration would wreak on [the

defendant's wife] and on [the defendant's] son is horrifying to me.  And the sentence I'm going to

impose on you is going to reflect that").

Yet as much as Mr. Debih wishes to support, and be present for, his family, they have often

been the ones supporting him, which likewise supports a mitigated sentence.  It is no stretch to say

that, without the support and love of his family, Mr. Debih would not have been able to endure the

past three years, and his self-inflicted separation from his wife and infant children has impressed

upon him both the seriousness of his prior conduct, and the necessity that he never again put

himself in a position to be removed from his wife and daughters.  Thankfully, despite the hardships

Mr. Debih's conduct has inflicted on his family, they stand ready to support Mr. Debih during any

period of Court-ordered supervision, which in and of itself supports a variant sentence.  *United

States v. Harding*, No. 05 Cr.1285-02 (RWS), 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006)

(imposing non-Guidelines sentence, noting "the significant network" ready to support defendant).

### 3.  Mr. Debih's Lack of an Acceptable Role Model

*Third*, as set forth above, ████████████████████████████████████

███████████████████████████████  The law mandates that, in taking stock of

the history and characteristics of the defendant, courts should "attempt[] to understand (as best one

can) what set a defendant upon [an] illegal course."  *United States v. Blake*, 89 F. Supp. 2d 328,

332 (E.D.N.Y. 2000).  Here, that analysis should recognize the poor role model that Mr. Debih

had in ████████████████████████████████████████████████████

While this does not excuse Mr. Debih's conduct, as a legal matter § 3553(a) makes that context

relevant in determining his sentence.  *See, e.g.*, *McCormick*, 2017 WL 492506 at *10 ("The context in which the offense took place indicate [defendant] was unusually influenced by a number of factors . . . .  While these circumstances do not excuse [defendant's] conduct, they do help to explain it").

We respectfully submit that each of these factors—Mr. Debih's lack of a proper role model in his youth, commitment to his family, and extensive cooperation with the government—supports the imposition of a mitigated sentence.  *See, e.g., United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation . . . ."); *United States v. Husein*, 478 F.3d 318, 324 (6th Cir. 2007) (affirming sentence of one-day credited for time served and three years supervised release, including 270 days of home confinement, despite an advisory Guidelines range of 37 to 46 months, where the court noted that defendant's "family is going to benefit more by your presence than society is going to benefit from your incarceration").

## II.    Respect for the Law and Just Punishment (§ 3553(a)(2)(A))

We also respectfully submit that a mitigated sentence is consistent with promoting the respect for law and the imposition of a just punishment.  *See, e.g.*, PSR at 28 ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████   Mr. Debih understands and acknowledges that his actions were wrong and broke the law, and were emblematic of a wider culture of insider trading that was likewise wrong and harmed the law abiding public by distorting our financial markets.  That is why he pled guilty and—at considerable risk to himself and his family—worked with the Government to aid in the breakup of this international cabal of insider trading, and further agreed to forfeit $49 million.  However, we

respectfully submit that a sentence of additional incarceration or fines, beyond what Mr. Debih has already endured, is not necessary to promote the interests of respect for law and retributive justice.

### A.  No Prison Term Is Necessary to Satisfy the Requirements of § 3553(a)

Consistent with the Probation Office's recommendation, we respectfully submit that a sentence of time-served is appropriate against this backdrop.  *See* PSR at 28-29.  As an initial matter, courts have recognized that a prison term is not necessary to serve the goals of retributive justice embodied in § 3553(a).  On the contrary, numerous courts have recognized that in an appropriate case, and if used wisely, a sentence without incarceration is sufficiently serious punishment to satisfy statutory mandates.  *See United States v. Brady*, No. 02-cr-1043, 2004 WL 86414, at *9 (E.D.N.Y. 2004) (Gleeson, J.) (probation "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing" (quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.)); *United States v. Coughlin*, No. 06-cr-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive.").

Indeed, where—as Mr. Debih has done here—a defendant has "sincerely and repeatedly expresse[d] remorse for his actions" and has "a strong[ ] desire to return to, and be a productive member of, his community," forgoing prison time does "not undermine the goals of achieving just punishment and promoting respect for the law."  *United States v. Hasanoff*, No. 10-CR-162 (KMW), 2020 WL 6285308, at *6 (S.D.N.Y. Oct. 27, 2020) (finding early release consistent with § 3553(a) factors).[8]

---

[8] Such an alternative sentence has other societal benefits.  A non-custodial sentence costs significantly less than incarceration and can be an effective means of reparation to society.  A non-incarceration sentence would also further the Justice Department's stated goal of finding alternatives to incarceration in appropriate cases.  *See* United States Courts, *Incarceration Costs Significantly More than Supervision* (Aug. 17, 2017), *available at*

**B. Mr. Debih's Pre-Sentencing Confinement Eliminates the Need for Further Incarceration**

However, even if the Court determines that some custodial sentence is merited by the facts of this case, the question of *how much* further punishment is appropriate necessarily takes into consideration the extent to which the defendant has *already* been punished. Here, Mr. Debih has already been incarcerated for fifteen months, and subject to an additional seven months of "home" confinement, which should be considered in weighing the need for additional confinement. *See* PSR at 28 ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

In this regard, it is particularly significant that a substantial proportion of that confinement was endured in deplorable conditions in a Serbian prison before Mr. Debih's extradition to the United States. The courts of this Circuit have long recognized that periods of pre-sentence custody spent in unusually arduous conditions merit recognition by courts in measuring a just sentence. *See, e.g.*, *United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (summary order) (noting that "[i]n imposing the sentence it did, the district court considered ... [among other factors,] the harsh conditions of [the defendant's] confinement at Combita" prison in Colombia where he was detained before being extradited to the United States); *United States v. Salvador*, No. 98 Cr. 484, 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that defendant's pre-sentence

---

https://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision (explaining that, in 2016, the cost to imprison a person after sentencing was $34,770 per year, whereas the cost to supervise a person in the community after sentencing was $4,392 per year, meaning that "[p]lacing an offender in a residential reentry center was about seven times more costly than supervision."); United States Sentencing Commission, *U.S. Sentencing Commission Announces 2017-2018 Policy Work, Proposes Guideline Amendments* (Aug. 17, 2017) *available at* https://www.ussc.gov/about/news/press-releases/august-17-2017 ("Among the proposed amendments published today are changes that would increase the number of federal offenders eligible for alternatives to incarceration. Informed by the Commission's multi-year study on recidivism, one of the proposed amendments would add a downward adjustment to the guidelines for first offenders.").

conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States ... warrant a downward departure"); *United States v. Torres*, No. 01 Cr. 1078, 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").

Examples of the conditions which merit variant sentences include a "lack of even minimal sanitary conditions and lack of food at times." *Salvador*, 2006 WL 2034637, at *4.  Other courts have determined that a lack of heating, hot water, and meaningful shelter during pre-sentence detention similarly justify a lower sentence. *Torres*, 2005 WL 2087818, at *2.

The conditions of Mr. Debih's confinement justify a variant sentence in this case.  As set forth in Mr. Debih's accompanying letter (Ex. 1), during his first months of confinement in the Belgrade Central Prison, he experienced an utter lack of sanitary conditions—with ten inmates sharing a single toilet and sink, without hot water.  Similarly, the facility only provided a single radiator for heating, and for only eight hours per day, even during the winter months in Serbia where the average low temperature is below freezing.  Mr. Debih was unable to communicate with the guards, who did not speak either French or English, and therefore could not make his needs or concerns known to prison staff.  The facility did not permit phone calls or emails, and also did not allow letters for Mr. Debih, who does not speak Serbian—which is required for inmates to communicate externally.  And for a non-smoker like Mr. Debih to be confined for months in an enclosed space with thick clouds of second-hand smoke crosses the line of acceptable conduct for facilities in the United States, and impermissibly jeopardizes the health of inmates.

Following Mr. Debih's extradition to the United States, he was, unfortunately, subjected to the harsh conditions at the MCC for an additional eight months from May of 2019 to the end of January 2020.  As set forth above, Mr. Debih's time at the MCC was emblematic of the chaos that

has prevailed there in recent years, with frequent and extended disruptions to inmates' access to hot water, a ubiquitous rat infestation, and a near complete lack of fresh air for the entirety of Mr. Debih's confinement there. This, too, merits consideration in determining whether any further incarceration is necessary to meet the goals of Section 3553(a).

Finally, as noted above, Mr. Debih was, further, subject to "home" confinement (an ocean and six time zones away from his family and children) for an additional seven-plus months following his release from custody in January of 2020. The conditions of that home confinement were particularly restrictive, consisting of GPS tracking, and an allowance of only four hours per week outside his hotel room in New York. And as set forth above, because of the then-ongoing coronavirus emergency, Mr. Debih was compelled to relocate on several occasions due to emergency facility closures, and for one ten-week stretch was literally confined in his room around the clock. This restrictive stretch of "home" confinement—thousands of miles from his actual home, with his family—also merits consideration in evaluating the need for any further punishment. *See, e.g.*, *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures").

At a minimum, to the extent the Court believes Mr. Debih's conduct merits some incarceration, the time Mr. Debih was confined under onerous conditions in a Serbian prison, the MCC, and home confinement should be credited against any period of incarceration at a multiple of the actual time served. *See, e.g.*, *United States v. Gonzalez*, No. 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), ECF No. 250 at 17:17-18:5 (noting that defendant's pre-sentence confinement of 24 months in the MCC during harsh COVID protocols "is equivalent to having served three years."). We therefore respectfully submit that, even if the Court were to determine that a custodial

26

sentence in a range beyond time-served otherwise would be merited on the facts of this case under

the Section 3553(a) factors, Mr. Debih's pre-sentencing confinement satisfies those requirements,

and no further incarceration is warranted.

### C. Mr. Debih's Agreement to Forfeit $49 Million Adds to the Punishment He Has Already Received and Eliminates the Need for Any Fine

The question of what further punishment should be meted out to Mr. Debih must also

take account of the fact that he has already agreed to forfeit to the Government a sum of $49

million.  And Mr. Debih has undertaken to fulfill that obligation and has already taken

affirmative steps to do so.  Indeed, the morning of his guilty plea, Mr. Debih signed the consent

order of forfeiture.  At the request of the Government, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

The fact that Mr. Debih has agreed to willingly forfeit this sum also counsels against the

imposition of an additional fine in this case, let alone a substantial one.  *See, e.g.*, PSR at 29

████████████████████████████████████████████████████████  As

both the Supreme Court and Second Circuit have recognized, a forfeiture "that may be

characterized, at least in part, as 'punitive,'" serves the same retributive purpose as a fine, and is

therefore analyzed under the rubric applicable to fines.  *United States v. Akhavan*, No. 20-CR-

188 (JSR), 2021 WL 3862123, at *5 (S.D.N.Y. Aug. 30, 2021) (quoting *United States v. Viloski*,

814 F.3d 104, 109 (2d Cir. 2016)); *see also United States v. Bajakajian*, 524 U.S. 321, 334–36 (1998).  To determine whether a forfeiture is punitive in nature, courts in this circuit ask whether it served a "remedial purpose to compensate the Government or return property to the rightful owner."  *Akhavan*, 2021 WL 3862123, at *6 (citing *Viloski*, 814 F.3d at 109).  If the answer to these questions is "no," a forfeiture is properly considered punitive, functionally indistinguishable from a fine.

Here, as in *Akhavan*, because Mr. Debih's $49 million forfeiture is not being used to compensate the Government for losses or make victims whole, it is properly considered as analogous to a fine.  Indeed, the only apparent victim to come forward seeking recompense as of sentencing is Takeda Pharmaceuticals, which has requested that a *separate* judgment of $186,430.99 be entered, pursuant to the Mandatory Victims Restitution Act, to compensate it for expense incurred responding to Grand Jury subpoenas.  *See* ECF No. 35-1.  That being the case, the $49 million forfeiture Mr. Debih has accepted is not compensatory but rather punitive in nature, and amply serves any retributive interest that could be advanced through a fine.  As a result, we respectfully submit that no further fine is necessary to satisfy the goals of § 3553(a).

██ **Mr. Debih** ████████████████████████████████████████

It also merits consideration that Mr. Debih ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

In sum, we respectfully submit that the substantial punishment that Mr. Debih has already

suffered as a result of the charged conduct—████████████████████████████

████—counsels in favor of meting out limited additional punishment at sentencing on

December 10, 2021.

## III.   Deterrence and Protection of the Public (§ 3553(a)(2)(B and C))

A sentence of incarceration also is not necessary to provide either general or specific

deterrence, or to protect the public.  As to general deterrence, the punishment already meted out to

Mr. Debih—arrest in front of his family, detention in a fetid Serbian prison, nearly two years'

separation from his newborn children, a reputation in tatters, forfeiture of $49 million, and the

constant fear of retribution from the targets of government investigations he aided—already

provides all the deterrent necessary.  *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir.

2010) (holding that § 3553 "does not require the goal of general deterrence be met through a period

of incarceration," and upholding district court's determination that probation and restitution

provided adequate deterrence, despite range of 27-33 months imprisonment).

Aside from serving as a warning to other members of society, the overwhelming

consequences that Mr. Debih has already suffered have more than ensured that Mr. Debih himself

will never embark on any remotely similar course of conduct again.  *United States v. Adelson*, 441

F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his conviction, it was

extremely unlikely that [the defendant] would ever involve himself in future misconduct").

Indeed, in this regard, it bears emphasis that Mr. Debih ceased his involvement in insider trading

activities once his first child was born, and nearly a year *before* he was arrested.  In other words,

the birth of his daughter was itself a sufficient deterrent to dissuade Mr. Debih from engaging in

29

further criminal activity—no additional incarceration is necessary to further confirm that Mr. Debih will never again break the law or threaten the integrity of financial markets.

There are, moreover, several other circumstances in this case which underscore that a sentence of imprisonment is not necessary to deter Mr. Debih from engaging in similar conduct in the future.  For example, as recited in the Presentence Report (PSR at ¶¶ 69-74) , Mr. Debih's entanglement in the facts underlying the instant case is his first brush with law enforcement, and courts have observed that first-time offenders like Mr. Debih are statistically less likely to reoffend. *See, e.g., United States v. Williams*, 662 F. App'x 366, 377 (6th Cir. 2016) (affirming a below-Guidelines sentence because the sentencing court "was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism").  And research has shown that offenders over the age of 40—like Mr. Debih—"exhibit markedly lower rates of recidivism in comparison to younger defendants."  *United States v. Hernandez*, No. 1:03-cr-01257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005).

Finally, studies have demonstrated that longer prison sentences do not necessarily serve as a general deterrent, further confirming that a sentence with no incarceration is sufficient to meet the goals of § 3553(a).  *See, e.g., Five Things About Deterrence*, Nat'l Inst. Of Justice (2016), *available at* https://nij.gov/five-things/pages/deterrence.aspx ("Sending an individual convicted of a crime to prison isn't a very effective way to deter crime;" "Increasing the severity of punishment does little to deter crime"); Gary Kleck & J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is there a "Collective Wisdom"?* 59 CRIME & DELINQ. 1006, 1031-33 (2013) ("[T]here is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves.").  Studies have also shown that a longer prison sentence is unlikely to have a specific deterrent effect.  "[T]here is little

30

evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013).  A prison sentence for Mr. Debih thus is not necessary to adequately serve the goals of deterrence or protect the public.

Mr. Debih's own submission confirms that no imprisonment need be ordered to accomplish deterrence.  As noted in his letter to the Court, if circumstances permit,



Importantly, neither of these pursuits bears any connection to trading in securities, a business Mr. Debih intends to leave firmly in his past.

## IV.   The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))

A sentence of probation or home confinement also would not create any disparity with the sentences imposed on those convicted of similar crimes.  To the contrary, imposing a sentence of incarceration on Mr. Debih—a foreign national and convicted felon—would *create* disparities in treatment between similarly situated inmates.

### A.   Sentencing Mr. Debih to Prison Would Create Disparities With Respect to Others Involved in the Insider Trading Ring

Imposing a sentence of incarceration on Mr. Debih would create, not ameliorate, a disparity between Mr. Debih's sentence and those of others involved in the very same insider trading schemes to which Mr. Debih pled guilty.  That is apparent from a review of the outcomes for others involved in the scheme:

- Bryan Cohen, a former investment banker at Goldman Sachs, pled guilty but did not cooperate with authorities, and according to the Government, was paid in exchange for inside

information. While the Government stipulated to a sentence of 30-37 months for Cohen, and the Probation Office recommended a sentence of 24 months, Judge Pauley sentenced Cohen to one year of home confinement, 1,500 hours of community service, and a $25,000 fine.

- Telemaque Lavidas, the son of a board member of Ariad Pharmaceuticals, Inc., neither pled guilty nor cooperated with authorities, instead putting the Government to its proof in a weeks-long trial, where he was ultimately convicted of stealing Ariad's corporate secrets and passing them along. The Probation Department recommended a sentence of 18 months, while the Government disagreed with Probation's recommendation and sought a sentence that was "substantially in excess of the Probation Department's recommendation." This Court sentenced Lavidas to one year and one day.

- Dov Malnik, a sophisticated investor, obtained and unlawfully traded on material non-public information in connection with multiple companies. Unlike Mr. Debih, Malnik did not cooperate with authorities or provide assistance to other ongoing investigations—to the contrary, Malnik attempted to evade accountability under U.S. law by fully contesting, up to and including appeals, his extradition from Switzerland to the United States. Malnik was sentenced by Judge Marrero to 30 months' imprisonment (before crediting eight months already served prior to extradition), a $50,000 fine, and forfeiture of $1,594,779.

- John Dodelande (an art dealer with access to investment bankers at Centerview Partners and Moelis) leaked information about more than fifteen M&A transactions in exchange for more than $12 million in cash for himself and his brother Kevin Dodelande. ███████████████████████████████████████████████████████████████████

Of these three co-conspirators, only Lavidas and Malnik received any prison time (with Malnik notably receiving credit for his pre-extradition confinement overseas). However, neither Lavidas nor Malnik cooperated with the Government to aid other, ongoing investigations—let alone provide the "extraordinary" cooperation recounted in the Government's Sentencing Submission. Viewing these sentences as a whole, any term of imprisonment imposed on Mr. Debih beyond what he has already endured pre-sentencing would create an undesirable disparity between his sentence and those imposed on others who are similarly situated. *See* PSR at 28

███████████████████████████████████████████

████████████████████████████████████

**B.  A Sentence of Imprisonment Imposed on Mr. Debih Would Be More Severe Than An Equivalent Sentence Imposed on an Identical Offender with Different Citizenship**

A sentence of imprisonment inflicted on Mr. Debih would also impose disproportionate hardship on him because of his status as a dual citizen of France and Switzerland.  If Mr. Debih were a United States citizen sentenced to a period of incarceration, as a non-violent first-time offender, he would in all likelihood be assigned to a prison camp—the least restrictive "minimum security" facility within the BOP.  However, given his non-citizen status, Mr. Debih would be classified by the BOP as a "Deportable Alien" and would be designated to at least a "low-security" (or higher-security facility).  This distinction matters:  The environment at a low security facility is significantly harsher and more difficult than that of a camp.

Moreover, if Mr. Debih were sentenced to a period of incarceration, upon completion of his sentence, he will in all likelihood be transferred directly into ICE custody and will stay incarcerated for additional weeks or months pending removal proceedings, thus functionally extending the duration of his time behind bars as compared to a similarly-situated U.S. citizen. To make matters worse, this additional time behind bars is likely to be served in the dreadful conditions plaguing ICE detention centers, thereby further exacerbating the undue disparity in punishment that would result.  *See* U.S. Department of Homeland Security, Office of Inspector General Report, OIG 19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019).  Indeed, the Inspector General's report describes significant food safety concerns, including risk of food-borne illness, inadequate medical care, improper punitive segregation (including strip searching detainees who were being moved into segregation absent an infraction), substantially subpar clothing, lack of basic supplies critical to the most

33

basic personal hygiene, dilapidated bathrooms permeated with mold and unusable toilets, nooses in cells, and other dangers and violations.  *Id.*

It is axiomatic that Mr. Debih's status as a non-citizen should not subject him to "adverse" sentencing treatment.  *See, e.g., United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994) ("A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." (citation omitted)).  Yet that is exactly what would transpire if Mr. Debih were sentenced to a period of imprisonment in this case.

### C.  Imposing a Mitigated Sentence Is Fully Consistent With Similar Outcomes in the Second Circuit and Nationwide

A sentence without further incarceration would also be broadly consistent with the treatment of similar offenders by the justice system as a whole.  Indeed, data compiled by the Sentencing Commission demonstrates that a mitigated sentence in this case would not create unwarranted disparities as against others convicted under similar statutes and guidelines provisions.

For example, since 2016, 81.4% of all defendants sentenced within the Second Circuit pursuant to the insider trading guideline—§ 2B1.4—have received a term of imprisonment of less than 24 months, which Mr. Debih has already served if his pre-sentence confinement is properly weighed.  *See Federal Offenders in Each District*, U.S. Sentencing Commission, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Dec. 2, 2021) (retrieving data for offenders from fiscal years 2016 to 2020 in Criminal History Category I who were sentenced within the Second Circuit for offenses where the primary guideline is § 2B1.4).  If that analysis is expanded to include *all* circuits, the percentage of offenders receiving a term of imprisonment of less than 24 months increases to 83.3%.  Even narrowing that analysis to solely include offenders within Zone D of the Sentencing Table (connoting higher offense levels), 80% of those sentenced

34

nationwide received a term of imprisonment of less than 24 months—a term which Mr. Debih should be deemed to have already served.

In sum, a sentence in this case requiring incarceration or levying additional fines would create unwarranted disparities with similarly situated offenders, and, as a result, we respectfully submit that a sentence without incarceration or an additional fine is appropriate.

*          *          *

A careful and holistic review of the § 3553(a) factors demonstrates that no further incarceration or fine is warranted on the facts of this case, in light of Mr. Debih's commitment to his family, the substantial assistance he provided to the Government despite the risk to himself and his family, his agreement to forfeit $49 million without controversy, and the sentences imposed on others convicted of similar conduct, both within the same insider trading ring and among offenders more broadly.

**CONCLUSION**

Mr. Debih recognizes that he has done wrong.  He will forever be remorseful for the disruption and fear this has brought on his family, as well as the distrust such conduct can sow within the financial markets.  Since coming to the realization that he had strayed from the proper path—well in advance of his arrest—Mr. Debih has made several difficult decisions aimed at atoning for his wrongs, ensuring that justice is done, and minimizing any further harm to his loved ones.  Under the circumstances, we respectfully submit that a sentence without further incarceration or fines is sufficient, but not greater than necessary, to achieve the goals of § 3553(a), and that such a sentence should therefore be imposed.

35

Dated: New York, NY
      December 3, 2021

Respectfully submitted,

KOBRE & KIM LLP

   /s/     Sean S. Buckley   

Sean S. Buckley
Steven G. Kobre
Jeffrey Newton
New York, New York 10022
Tel: 212 488 1200

*Attorneys for Defendant Marc Demane Debih*